**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

SANDRA BRISTOW,

              *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL SECURITY,

              *Defendant*.

_____/

CASE NO. 2:17-cv-13769

DISTRICT JUDGE STEPHEN J. MURPHY, III

MAGISTRATE JUDGE PATRICIA T. MORRIS

## REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 13, 14)

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff Sandra Bristow is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (Doc. 13), be **DENIED**, that the Commissioner's Motion, (Doc. 14), be **GRANTED**, and that this case be **DISMISSED**.

## II.    REPORT

### A.  Introduction and Procedural History

This is an action for judicial review of a final decision by the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits ("DIB") under Title II, 42 U.S.C. § 401 *et seq. See* (Doc. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the

1

undersigned Magistrate Judge. (Doc. 3). The matter is currently before the court on cross-motions for summary judgment. (Docs. 13, 14).

Plaintiff filed for DIB on August 29, 2014, alleging disability beginning December 7, 2011. (Doc. 11 at PageID.183-184). Her claim was initially denied on January 21, 2015. (Doc. 11 at PageID.38). At Plaintiff's request, an administrative hearing was held on August 10, 2016, before Administrative Law Judge ("ALJ") Timothy C. Scallen. (Doc. 11 at PageID.52-86). Several months later, the ALJ issued a decision denying Plaintiff's claims. (Doc. 11 at PageID.35-51). In September 2017, after reviewing additional exhibits,[1] the Appeals Council denied Plaintiff's request for review. (Doc. 11 at PageID.29-34). This action followed. (Doc. 1). Plaintiff and Defendant have filed cross-motions for summary judgment, (Docs. 13, 14), and Plaintiff has also filed a reply, (Doc. 15).

## B.  Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations

---

[1] In the Sixth Circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, any "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision—the final decision of the Commissioner—the court can consider only evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* (internal citations omitted).

### C. Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your residual functional capacity ["RFC"] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered the claimant unable to engage in substantial gainful activity. 42 U.S.C. §

4

423(d)(1)(A). The burden transfers to the Commissioner if the analysis reaches the fifth step. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ concluded that Plaintiff had not been under a disability within the meaning of the Social Security Act from December 7, 2011, through the date of the decision, October 28, 2016. (Doc. 11 at PageID.38). The ALJ began by finding that Plaintiff had not engaged in substantial gainful activity since her alleged onset date. (*Id.* at PageID.40). He then found that Plaintiff had the following severe impairments: major depressive disorder, recurrent, moderate; and a history of alcohol abuse. (*Id.*). Next, he noted that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (*Id.*). Before moving to the next step, he determined that Plaintiff had the RFC to perform "a full range of work at all exertional levels but with the following nonexertional limitations: limited to simple, routine, repetitive tasks; tasks which require[] little judgment and can be learned in a very short time; limited to low stress work meaning minimal changes in work procedures and responsibilities." (*Id.* at PageID.41). Finally, the ALJ concluded that although Plaintiff would be unable to

perform her past relevant work due to her RFC, jobs existed in significant numbers in the national economy that Plaintiff could perform. (*Id.* at PageID.44-45).

### E.  Administrative Record

#### 1.  Medical Evidence

The Court has thoroughly reviewed Plaintiff's medical record. In lieu of summarizing her medical history here, the Court will make reference and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.  Plaintiff's Function Report

Plaintiff completed an adult function report on October 24, 2014. (Doc. 11 at PageID.226-233). In it, she indicated that she lived in a house with family. (*Id.* at PageID.226). Plaintiff stated that her ability to work was limited by her inability to focus, memory loss, anxiety, and difficulty completing tasks; she also reported she suffered from diarrhea two to three days per week. (*Id.*).

On an average day, Plaintiff began by taking her medication and getting dressed. (*Id.* at PageID.227). On days she worked, Plaintiff would "get ready and go to work," and then go to bed "shortly" after coming home. (*Id.*). On her days off, Plaintiff might lie back down or watch television. (*Id.*).

Plaintiff reported that since onset, she could no longer "sleep so much" or "function at a higher level." (*Id.*). Now, six or seven days a week she woke up every hour or two, and had nightmares. (*Id.*).

She indicated that she had no problem with personal care, including dressing, bathing, caring for her hair, shaving, feeding herself, or using the toilet. (*Id.*). She set

6

alarms to help her remember to take her medication, but never needed reminders to take care of personal needs or grooming. (*Id.* at PageID.228).

Her cooking habits had not changed; she prepared her own meals daily—usually sandwiches or "ready made foods," cheeses, and juice. (*Id.*). Around the house, once or twice a week she would clean the bathrooms for twenty-five minutes, clean the bedroom for half an hour, and do laundry for one hour, all without help or encouragement. (*Id.*) Her son did the yard work. (*Id.* at PageID.229).

She left the house two to three days a week to go to work or to the store. (*Id.*). About once or twice a week, she went shopping for food and to get gas, which she estimated she usually took an hour and a half. (*Id.*) She was able to drive and to go out alone, although she sometimes was afraid to "go in [her] car alone due to anxiety." (*Id.*). She was also able to pay bills, count change, handle a savings account, and use a checkbook or money orders. (*Id.*).

As for hobbies, she enjoyed watching television every day. (*Id.* at PageID.230). She reported that before onset, she used to go to the movies, read for pleasure, go for walks, swim, and enjoy family activities and live music, as well as attend church and sporting events. (*Id.*). She stated, "I don't go outside for any recreations when I used to," though she did not explain why. (*Id.* at PageID.231). One to five times a week, she talked on the phone with her son, daughter-in-law, grandchildren, two daughters, and mother. (*Id.* at PageID.230) She indicated she did not have any trouble getting along with family, friends, neighbors, or others, and she got along "very well" with authority figures. (*Id.* at PageID.231, 232).

Asked to check which abilities were affected by her illness, injuries, or conditions, Plaintiff marked the following: talking, hearing, seeing, memory, completing tasks, concentration, understanding, and following directions. (*Id.* at PageID.231). She explained that when talking she sometimes stumbled over words, she had hearing loss in her right ear that "seem[ed] to be worsening," she needed glasses for her vision, and her short term memory was "bad." (*Id.*). Often, she would be unable to recall what someone had just said to her. (*Id.*). Further, she found she had a hard time concentrating, and was "unable to complete tasks in a timely manner." (*Id.* at PageID.233). Sometimes she needed to read directions three or four times before she could "grasp the subject," or struggled to follow instructions because she could not remember them. (*Id.*).

Plaintiff estimated that she could walk ten minutes before needed to rest for two to three minutes, and could pay attention for fifteen minutes. (*Id.* at PageID.231). She indicated that she could not finish what she started. (*Id.*). Her ability to follow written instructions was "fair to good"; she could follow spoken instructions if she took notes. (*Id.*). She reported that she did not handle stress well "most of the time." (*Id.* at PageID.232). Changes in routine she could sometimes handle, and sometimes not. (*Id.*).

Her medication citalopram caused headaches as a side effect. (*Id.* at PageID.233).

### 3.  Third Party Function Report

Plaintiff's son, Dayne Bristow, completed a Third Party Function report for Plaintiff on the same date, October 25, 2014. (*Id.* at PageID.234). He had known Plaintiff for twenty-eight years and spent four to six hours a day with her, up to six times per

8

week. (*Id.*). In fact, at that time Plaintiff lived with him, his wife, and Plaintiff's two grandchildren. (*Id.* at PageID.241).

Plaintiff's son reported that "[o]ften times her depression leaves her in her room for hours or even days. During this time she mostly sleeps and does not participate in any family function. Her anxiety makes her miss work at times. She gets such bad anxiety that she is unable to perform simple tasks." (*Id.* at PageID.234, 241). Additionally, she frequently woke up at night due to anxiety, and had difficulty remembering things. (*Id.* at PageID.241).

Plaintiff's daily routine varied depending on how she was feeling: sometimes she would get up, get ready and go to work, come home, relax, eat, and go to bed. (*Id.* at PageID.235). "Often" she would get up, watch television, "maybe" eat something, "spen[d] lots of time by herself," and sleep. (*Id.* at PageID.235, 241). Before onset, Plaintiff had been able to work full-time, take care of a rental home, and do "day to day things." (*Id.* at PageID.235).

Plaintiff made her own meals daily, taking fifteen to thirty minutes to do so. (*Id.*). She prepared sandwiches, cheeses, soup, macaroni and cheese, eggs, yogurt, popcorn, "rice dishes," and "other simple dishes." (*Id.*). As for household chores, Plaintiff spent thirty minutes to two hours cleaning and doing the laundry once or twice a week. (*Id.*). She did not need help or encouragement to do so. (*Id.*). Plaintiff's son did the yard work. (*Id.* at PageID.237). Plaintiff was also able to pay bills, count change, handle a savings account, and use a checkbook or money orders. (*Id.* at PageID.237). She had no problems performing personal care. (*Id.* at PageID.235).

Plaintiff's son indicated that she was able to go out alone to work or to the store, and was able to drive, but that she was also "often in her room depressed." (*Id.*). Twice a week she shopped in stores for groceries and gas for an hour or two. (*Id.*). At times she was afraid to leave the house. (*Id.* at PageID.240).

As for Plaintiff's hobbies, her son reported that her only hobby was watching television. (*Id.* at PageID.238). Because she had a hard time focusing, she "often rewatche[d] the same show again." (*Id.*).

Previously, Plaintiff had been in the habit of attending family functions, concerts, and church, and she had enjoyed going on walks and reading. (*Id.*). Now, her son explained, she talked on the phone daily and spent time with people at work and at the store, as well as with her son, his wife, and her two grandchildren, whom she lived with. (*Id.* at PageID.238, 241). She had no problems getting along with family, friends, neighbors, or others, though she no longer attended social events due to her depression and anxiety. (*Id.* at PageID.238-239). She also got along well with authority figures. (*Id.* at PageID.240).

Next, Plaintiff's son indicated that her illnesses, injuries, or conditions affected her ability to talk, hear, complete tasks, concentrate, and follow instructions, in addition to her memory and understanding. (*Id.* at PageID.239). He explained that she often stumbled on her words, and had difficulty concentrating on or remembering what was said to her. (*Id.* at PageID.239, 241). She needed "things explained to her more in order to follow instructions." (*Id.* at PageID.241). Plaintiff's son estimated that she could pay attention for ten minutes to an hour, depending on the subject. (*Id.* at PageID.239). She

10

did not finish what she started. (*Id.*). She sometimes needed to reread written instructions, and did not follow spoken instructions well because she would forget what had been said. (*Id.*). Nor did she handle stress well—she would become anxious, "shut[] down," and go to her room "to be alone." (*Id.* at PageID.240).

Plaintiff's son did not know how far she could walk before needing to stop and rest, or how long she needed to rest before she could resume walking. (*Id.* at PageID.239).

As a final matter, Plaintiff's son noted that her Celexa caused her headaches as a side effect. (*Id.* at PageID.241).

### 4.  The Administrative Hearing

#### a.  Plaintiff's Testimony

On August 10, 2016, an administrative hearing in Plaintiff's case was held before ALJ Timothy Scallen. (Doc. 11 at PageID.52-86).

At the time of the hearing, Plaintiff was fifty-three years old and working at an AAA office in Rochester Hills, Michigan. (*Id.* at PageID.55-56). She stood 5'3" tall and weighed 192 pounds. (*Id.* at PageID.82-83). She had earned her GED and completed a college course in computer information systems. (*Id.* at PageID.55).

Plaintiff explained that she had first begun working at AAA in 2003, left in 2011, and then worked at State Farm Office for less than a year before returning to AAA. (*Id.* at PageID.57, 59). While at AAA in 2011, she began missing "maybe two or three days a month" after her brother-in-law's death by suicide. (*Id.* at PageID.75). She would call in sick because she "couldn't get up out of bed," she "was having such a racing panic

attack." (*Id.*). Prior to his death, she stated, her memory and concentration had been good, she had done good work, and she had never had a bad review. (*Id.* at PageID.76).

Next, Plaintiff testified that she had worked less than twenty hours a week at a State Farm Office between October 2014 and April 2015. (*Id.* at PageID.57-58). There, they had tried to train her in "tasking," which she described as using a computer to "take care of each situation with a different customer of what needs to be done." (*Id.* at PageID.58). Her pay had been $12 an hour. (*Id.* at PageID.59). The office had let her go in April 2015 because she could not do the work due to her anxiety. (*Id.*).

Following that job, Plaintiff returned to work at AAA in February 2016, where her supervisor was more understanding of her memory loss. (*Id.* at PageID.59-60). At the time of the hearing, she was working there an average of twelve hours a week, at a rate of $10 an hour. (*Id.* at PageID.60). Her supervisor "moved [her] toward the back and just gave [her] more tasks that were . . . lighter," (*id.* at PageID.56); her duties included making phone calls to customers, making records of those calls, and filing, (*id.* at PageID.60-61). She sometimes got anxiety attacks at work and had "to go in the bathroom and breathe." (*Id.* at PageID.74).

When the ALJ asked what had prevented Plaintiff from working full time since her alleged onset date of December 7, 2011, Plaintiff testified that she had issues with diarrhea every time she ate, sometimes eight times a day. (*Id.* at PageID.61-62). To cope, she said, she did not eat before she went to work. (*Id.* at PageID.62). On an average day, she spent roughly two hours in the bathroom. (*Id.* at PageID.77). Sometimes during a "really bad episode," she would have vomiting and diarrhea simultaneously. (*Id.*).

12

Plaintiff then testified that the vomiting occurred about four days a month, "a couple" of times per day. (*Id.* at PageID.78). Further, she stated, "when I'm out in public I have to always watch where the bathroom is because I don't know when it's going to happen and I've had—this is really embarrassing, but I've had accidents in my pants." (*Id.* at PageID.77-78). She was working with her doctor to find a gastroenterologist, but Plaintiff thought the vomiting and diarrhea were "mostly from anxiety." (*Id.* at PageID.62).

Plaintiff suffered from daily anxiety, brought on by worrying about how she would support herself and "things . . . that might happen." (*Id.* at PageID.62-63). She had four to five panic attacks every day, during which her heart started beating "very fast," her arms and hands became very sweaty, and she sometimes felt like she might pass out. (*Id.* at PageID.63). By Plaintiff's estimate, each panic attack lasted between twenty and thirty minutes. (*Id.* at PageID.63-64). For relief, she tried deep breathing exercises. (*Id.*).

Plaintiff further testified that she had good and bad days with her mood. (Doc. 11 at PageID.76). When she was "really depressed," she would spend hours to days in bed. (*Id.* at PageID.76-77). She estimated that during that course of a typical month, she would have ten to twelve bad days spent mostly in bed. (*Id.* at PageID.77).

She also described difficulty with her memory, and testified that her current employer had to repeat herself or Plaintiff had to "write everything down." (*Id.* at PageID.64). She had seen a neurologist on her doctor's recommendation, but her EEG and EKG were normal and the neurologist believed her memory issues stemmed from her anxiety. (*Id.* at PageID.81). Plaintiff had first noticed her memory problems in 2011,

when she suffered her brother-in-law died by suicide. (*Id.* at PageID.65). Plaintiff felt she had not been the same since then, and her anxiety had "escalated." (*Id.*).

Plaintiff also testified to some paranoia and some psychosis. (*Id.* at PageID.79). She said she sometimes felt like people were watching her; when she visited her son's house she sometimes saw their dog that had died, though she knew the dog was not there. (*Id.*).

Additionally, Plaintiff complained that about ten months ago, she had started experiencing spasms in her neck, and numbness and tingling in her left arm. (*Id.* at PageID.71, 73). She stated that the numbness and tingling had been occurring daily, but were improving with therapy. (*Id.*). By Plaintiff's estimate, she had been to therapy about ten times. (*Id.* at PageID.73). To the best of her knowledge, the cause was "[s]omething to do with cervical." (*Id.* at PageID.71). She stated that she also had a "little bit" of a back issue due to two herniated discs. (PageID.83). Lastly, Plaintiff smoked, but was attempting to quit. (*Id.* at PageID.72).

Plaintiff testified that she lived alone and had no problems with personal care such as getting dressed or taking showers. (*Id.* at PageID.66). She did all the housework herself, including laundry, dishes, and cooking, though sometimes she did not get it all done. (*Id.*). She cooked simple, bland meals so as not to upset her stomach. (*Id.*). Plaintiff could drive, and went to the food bank once a month. (*Id.*). Her youngest daughter helped her pay rent. (*Id.* at PageID.67). She was able to concentrate and focus on tasks at home, such as making a meal, and said she would be able to, for example, make a phone call to gather information. (*Id.* at PageID.74).

14

As for her social life, Plaintiff testified that she got along well with others, including her boss, coworkers, and customers, though customers sometimes became upset and she took it personally. (*Id.* at PageID.81). Generally, she did not "really have a social life." (*Id.* at PageID.68). She had been dating someone for about a year, but told the ALJ it was "not really working out." (*Id.*). She had two daughters in the area. (*Id.*). Though her family sometimes held get-togethers, "[a] lot of times" she would not go because she was "really depressed." (*Id.* at PageID.69). Though she had grandchildren nearby, she did not see them often, explaining, "I don't want them to see me upset and anxious, because they're at a very impressionable age." (*Id.* at PageID.78).

Her only hobby was watching television, but she would not sit and watch it for half an hour because "it just doesn't interest [her] after a while." (*Id.* at PageID.69). explained, "I just keep it on for my eyes. . . . And I just try to avoid and look the other way." (Doc. 11 at PageID.69-70). She also read the Bible in the mornings. (*Id.* at PageID.70).

Plaintiff's medications comprised Abilify, Xanax, Celexa, Baclofen for pain, and nasal sprays. (*Id.* at PageID.70-72).

### b.  The Vocational Expert's Testimony

Vocational Expert ("VE") Kelly Stoker also testified at the hearing. (Doc. 11 at PageID.82-85). She began by clarifying that Plaintiff's past work was as an insurance customer service rep, which was skilled work at a sedentary exertional level. (*Id.*). Her current work was a reduced version of the same position. (*Id.*).

The ALJ then posed a hypothetical to the VE:

15

> [A]ssume an individual of the claimant's age, education, and work experience, who is capable of performing . . . at all exertional levels. But has the following non exertional limitations. Limited to simple, routine, and repetitive tasks. Tasks which . . . require[] little judgment and can be learned in a very short period of time. Furthermore, limited to low stress environment, meaning minimal changes in the work procedures, work responsibilities.

(*Id.* at PageID.84).

The VE stated that someone subject to those limitations could not perform Plaintiff's past work, but could work as an assembler (150,000 jobs nationally), an inspector (90,000 nationally), or a packager (120,000 nationally). (*Id.*). All three positions would be at the light exertional level, unskilled, with an SVP of 2. (*Id.*).

Next, the ALJ inquired how many rest breaks and absences employers typically allowed. (*Id.*). The VE responded that a fifteen-minute break in the morning, a fifteen-minute break in the afternoon, and thirty to forty-five minutes for lunch would be standard. (*Id.*). An employee could also take an additional five-minute bathroom break in the morning and in the afternoon. (*Id.* at PageID.85). One absence per month would be tolerated, not on a consistent basis. (*Id.* at PageID.84-85). If a person were likely to exceed the allowed rest periods or absences, that would be work preclusive. (*Id.* at PageID.85). Further, the VE testified that it if a  person were likely to be off-task more than fifteen percent of the normal eight-hour workday, that would be work preclusive as well. (*Id.*).

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories:

"acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When acceptable medical sources issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). The ALJ must also apply those factors

to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540–42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1–2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1–2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the person's RFC, or the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

18

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640–41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

The claimant must provide evidence establishing his or her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

### G. Analysis

Plaintiff argues that the case should be remanded because (1) the ALJ erred in his treatment of several opinions from treating and other sources, and (2) the ALJ failed to consider Plaintiff's physical impairments when crafting her RFC.

### 1. The ALJ's Treatment of Various Medical Opinions

### i. Dr. Aleida Rivera's Medical Opinion

First, Plaintiff argues that the medical opinion from her primary care provider, Dr. Aleida Rivera, should have been afforded controlling weight. (Doc. 13 at PageID.569-571). Second, she avers that even if the ALJ did not err in declining to afford the opinion controlling weight, he erred in failing to discuss the required factors and give good reasons for the weight he did assign. (*Id.* at PageID.572-573). Defendant answers that the

ALJ properly disregarded Dr. Rivera's opinion because it speaks on a matter reserved to the Commissioner, and that regardless, any error is harmless because Dr. Rivera's opinion is "patently deficient." (Doc. 14 at PageID.590-93).

As explained in the section above, the opinions of a treating physician[2] receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. If an ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then consider six factors when deciding what weight the opinion is due: whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). At bottom, the regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007).

Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. 20 C.F.R. § 404.1527(d). Regardless, the

---

[2] Although the ALJ does not explicitly characterize Dr. Rivera as a treating source, Defendant does not contest that she is. *See* (Doc. 14 at PageID.590-93). I therefore proceed under the assumption that Dr. Rivera is a treating source.

ALJ must still provide good reasons for not accepting the opinion. *See Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007) (citing SSR 96–5p, 1996 WL 374183 (July 2, 1996)); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984).

Dr. Rivera's opinion comprised a single page with two check boxes and one handwritten sentence. (Doc. 11 at PageID.464). The first question inquired whether Plaintiff's "depression condition, anxiety condition, ADD condition and chronic diarrhea condition all in combination constitute a severe medical impairment"; Dr. Rivera checked "yes." (*Id.*). The second question asked whether Plaintiff could "sustain working a 40 hour a week sedentary job"; Dr. Rivera checked "no." (*Id.*). In the space to explain, she wrote: "Patient unable to concentrate, too anxious to keep doing a particular task." (*Id.*).

The checkbox answers, at least, do seem to speak to the ultimate issue of disability, a matter reserved for the Commissioner. *See* 20 C.F.R. § 404.1527(d)(3). Still, I suggest that the ALJ falls short of providing "good reasons" for assigning Dr. Rivera little weight. The ALJ gave little weight to Dr. Rivera's opinion for two reasons: first, because she was not a mental health specialist, and second, because Plaintiff "has had other mental health providers who could have completed a medical source statement but did not." (Doc. 11 at PageID.44). Both of these reasons go to Dr. Rivera's specialization—or lack thereof—which is one factor for the ALJ to consider when deciding how much weight to give a medical opinion. 20 C.F.R. § 404.1527. But a physician need not be a mental health specialist to diagnose and treat common mental illnesses such as anxiety. *See Payne v. Comm'r of Soc. Sec.*, 402 F. App'x 109, 121 (6th Cir. 2010); *Bordeaux v. Astrue*, No. 1:10-CV-00844, 2011 WL 1130394, at *9 (N.D.

Ohio Mar. 7, 2011), report and recommendation adopted sub nom. *Bordeaux v. Comm'r of Soc. Sec.*, No. 1:10CV844, 2011 WL 1113873 (N.D. Ohio Mar. 28, 2011) ("While a doctor's specialty may be a factor in how much weight to ascribe an opinion, the mere fact that [the source] is not a mental health specialist does not adequately explain why his opinion was given only limited weight."); *Payne v. Astrue*, No. 1:09-CV-140, 2011 WL 1768843, at *2 (N.D. Ohio Apr. 14, 2011), report and recommendation adopted, No. 1:09 CV 140, 2011 WL 1753307 (N.D. Ohio May 9, 2011) ("[A]n ALJ must consider several factors when determining how much weight to assign to the treating physician's opinion—the specialization of the treating source is merely one factor.") (internal citation omitted). I suggest that in and of itself, this is not a sufficient reason to dismiss Dr. Rivera's opinion.

Ultimately, however, I suggest that any error on the ALJ's part is harmless because Dr. Rivera's opinion is "patently deficient." Her medical source statement amounts, in its entirety, to two checked boxes and a single sentence. (Doc. 11 at PageID.464). She provides no explanation of what specific symptoms Plaintiff reported, signs she observed, or medical and diagnostic techniques she used to reach her conclusion. Nor does she explain Plaintiff's functional limitations: how long she can concentrate at one time, for example. *Jackson v. Comm'r of Soc. Sec.*, No. 1:16-CV-14404, 2017 WL 4699721, at *7 (E.D. Mich. Oct. 19, 2017) ("[B]ecause Dr. Hussain's medical source statement is in check-box format, it is an impotent addition to the record with little to no persuasive value.") (citing *Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563, 567 (6th Cir. 2016)). Thus, I suggest that because as Dr. Rivera's opinion was

"patently deficient," the ALJ's failure to properly consider it was harmless. *Bragg v. Comm'r of Soc. Sec.*, No. 11-10579, 2012 WL 1079942, at *10 (E.D. Mich. Jan. 24, 2012), *rep. & rec. adopted*, 2012 WL 1079925 (E.D. Mich. Mar. 30, 2012) (finding harmless error where ALJ failed to explicitly consider patently deficient opinion by physician who "offered no objective evidence on how she came to her conclusions").

As a final matter, I turn to Plaintiff's argument that remand is warranted because the ALJ failed to discuss all the requisite factors in determining what weight to assign Dr. Rivera's opinion. While ALJs are obligated to consider all of the factors listed in 20 C.F.R. § 404.1527(c) in evaluating treating source opinions, they are not obliged to reference every factor in the decision. *See Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011). They simply must give "good reasons" for the weight they assign. *Id.* As explained above, I suggest the ALJ failed to give "good reasons," but that any error is harmless because Dr. Rivera's opinion was patently deficient.

For all of the above reasons, I suggest there is no cause for remand on these grounds.

### ii.  The Medical Opinion from Henry Ford Behavioral Health

The ALJ declined to give compelling weight to the opinion from Henry Ford Behavioral Health, reasoning in part that Plaintiff's General Assessment of Functioning (GAF) score of 40 "is indicative of serious symptoms, but is not necessarily consistent with someone who is unable to perform work related activities on a sustained basis." (Doc. 11 at PageID.43). Plaintiff paints the ALJ's characterization of her GAF score as "a medical determination that he was not qualified to make." (Doc. 13 at PageID.573-574).

The ALJ is correct, however, that a GAF score is not determinative of whether a person is under a disability. The Commissioner has repeatedly "declined to endorse the [GAF] score for 'use in the Social Security and SSI disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" *Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007) (citations omitted). And the Sixth Circuit has emphasized that no "statutory, regulatory, or other authority require[s] the ALJ to put stock in a GAF score in the first place." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006).

Further, though Plaintiff again takes issue with the ALJ's failure to discuss every factor from 20 C.F.R. 404.1527(c), (Doc. 13 at PageID.574), the fact remains that the ALJ is not required to provide an "exhaustive factor-by-factor analysis." *Francis*, 414 F. App'x at 804. As Plaintiff does not argue the point further than to state that "the ALJ's perfunctory rejection of this medical opinion was legally insufficient," I suggest she has waived this issue. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citation and quotation omitted).

For all of the above reasons, I suggest remand is not warranted on this basis.

iii.    **Consultative Examiner Dawn Bane Gventer's and State Agency Consultant Edward Czarnecki's Medical Opinions**

Finally, Plaintiff takes issue with the ALJ's reliance on the opinions of consultative examiner Dawn Bane Gventer and agency consultant Edward Czarnecki for several reasons, the most concerning of which is that the ALJ allegedly erred in his assignment of weight to Gventer's opinion, which in turn infected his analysis of Czarnecki's opinion. (Doc. 13 at PageID.574-575). The ALJ must "always give good reasons. . . for the weight" given a "treating source's opinion." 20 C.F.R. § 404.1527(c)(2). Czarnecki and Gventer, however, were not treating sources but "other sources." The ALJ need not give good reasons with respect to other sources, but still "generally should explain the weight given to opinions from . . . 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6 (S.S.A. Aug. 9, 2006).[3]

In January 2015, psychologist Gventer conducted a consultative examination for Plaintiff's claim. (*Id.* at PageID.378-382). Her ultimate diagnostic impression for Plaintiff was "Major Depressive Disorder, Recurrent, Moderate," with a prognosis of fair. (*Id.* at PageID.380-381). She explained: "Based on the results of the current evaluation, the claimant is oriented in all spheres. Her memory and concentration are both impaired

---

[3] I note that although SSR 06–03p was rescinded effective March 27, 2017, it remained in effect at all relevant times in this case.

indicating some difficulty learning and retaining new information. She has a fund of knowledge that is consistent with her educational achievements. She has appropriate insight and judgment. She is having a difficult time maintaining work at this time; however, it should be noted that she is not in counseling so the efficacy of this is unknown at this time. There were no functional restrictions noted." (*Id.* at PageID.381).

Edward Czarnecki assisted in the evaluation of Plaintiff's claim at the initial level. (Doc. 11 at PageID.88-99). He found Plaintiff to have the severe medically determinate impairment "Affective Disorders." (*Id.* at PageID.93). He determined she had moderate restriction in activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (*Id.* at PageID.94). Ultimately, he explained that the Plaintiff had a history of depression, and she was responding to treatment with Celexa. (*Id.* at PageID.97). He noted that Gventer had found she had no functional restrictions, and that Plaintiff was currently working part-time and able to attend to her activities of daily living "with a reasonable degree of independence." (*Id.*). He concluded she "retain[ed] the mental capacity for simple, rote, repetitive, unskilled work-related activity," and Plaintiff was found not disabled at the initial level. (*Id.* at PageID.97-99).

In the ALJ's opinion, he summarizes Gventer's opinion (referring to her only as "the consultative examiner") as simply "that the claimant will have a difficult time maintaining work." (Doc. 11 at PageID.43). He explains that he afforded little weight to that opinion "as it is based upon a one-time examination and based upon information not consistent with the record as a whole." (*Id.*).

26

That done, the ALJ continues his recitation of the record evidence, including Plaintiff's treatment at Stonebrook Family Physicians, a lifestyle questionnaire completed by Plaintiff, various psychological treatment notes, and the opinion of Dr. Rivera. (*Id.* at PageID.43-44). Finally, he concludes the section by crafting limitations for Plaintiff "consistent with those determined by *the consultative examiner* and Edward Czarnecki, Ph.D., who reviewed the evidence at the initial level of adjudication and determined the same. Since these opinions remained consistent, *significant weight* is given to them." (*Id.*) (internal citation omitted) (emphasis added). Thus, it would appear that the ALJ assigned both little weight *and* significant weight to the consultative examiner, Gventer. And further, it would appear he assigned great weight to the opinion of Czarnecki for the sole reason that it was consistent with the opinion of Gventer, to whom he had earlier assigned little weight.

Unfortunately, the ALJ's sparse analysis offers little direction for a reader seeking to untangle this reasoning. Nevertheless, Defendant gamely attempts an explanation. Defendant interprets the ALJ as having given little weight to only *part* of Gventer's report—the part in which Gventer found Plaintiff was "having a difficult time maintaining work at this time"—and having given great weight to Gventer's statement that "[t]here were no functional restrictions noted." (Doc. 14 at PageID.595-596). That reading would seem to be undermined, however, by the rationale the ALJ offered for disregarding the first part of Gventer's opinion: that it was based on a one-time examination and information not consistent with the record as a whole—which would seem equally applicable to the remainder of Gventer's opinion.

Regardless of whether the Defendant has divined the ALJ's intended meaning, it remains the ALJ's duty to "ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6 (S.S.A. Aug. 9, 2006). That the ALJ has not done.

Plaintiff claims this inconsistency is "in and of itself worthy of reversal and remand." (Doc. 13 at PageID.576). But not every procedural error necessitates remand. See Rabbers v. Comm'r of Soc. Sec., 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless 'the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.'"); cf., e.g., Murphy v. Comm'r of Soc. Sec., No. CIV.A. 13-11795, 2014 WL 2558685, at *8 (E.D. Mich. Apr. 30, 2014), report and recommendation adopted, No. 13-11795, 2014 WL 2558686 (E.D. Mich. June 6, 2014) ("While the ALJ should have discussed Dr. Douglass' opinion, the Court finds his failure to explicitly explain the weight given to this opinion was harmless error, as the ALJ's RFC assessment clearly is consistent with Dr. Douglass' opinion."). Courts in this circuit have previously remanded cases where the ALJ either entirely failed to discuss an "other" opinion in the record, e.g., Lohr v. Comm'r of Soc. Sec., 559 F.Supp.2d. 784, 791–94 (E.D. Mich. 2008), or failed to adequately discuss why he assigned a certain weight to them, e.g., Rush v. Astrue, No. 2:10–CV–97, 2011 WL 3205282, *3–5 (E.D. Tenn. July 27, 2011). In those cases, however, the opinions were indisputably favorable to Plaintiff—in other words, proper consideration of them could

28

potentially have resulted in a more restrictive RFC and a favorable finding of disability for Plaintiff. Not so in this case. Here, Czarnecki's opinion accords with the ALJ's ultimate finding: that Plaintiff is capable of simple, routine, repetitive tasks requiring little judgment that can be learned in a very short time, so long as the work is low stress with minimal changes in work procedures and responsibilities. (Doc. 11 at PageID.41). Though Gventer's opinion is more ambiguous—she stated that Plaintiff was "having a difficult time maintaining work at this time" and Plaintiff's "memory and concentration [were] both impaired"—she ultimately concluded that Plaintiff had "no functional restrictions." (PageID.381).

Moreover, critically, Plaintiff fails to argue that proper consideration of these opinions would result in a more favorable outcome on remand. Her argument ends with her contention that the contradiction itself mandates remand. Since Plaintiff fails to allege any prejudice resulting from this procedural error, and especially considering the relevant opinions are consistent with the ALJ's RFC, I suggest this error does not warrant remand.

A few of Plaintiff's arguments regarding Czarnecki and Gventer remain. Plaintiff expresses some concern that Czarnecki "did not have the benefit of reviewing a substantial portion of the medical evidence." (Doc. 13 at PageID.575, n.6). As the Sixth Circuit has noted, "[t]here will always be a gap between the time the agency experts review the record and give their opinion." *Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 831 (6th Cir. 2009). "Absent a clear showing that the new evidence renders the prior opinion untenable," however, "the mere fact that a gap exists does not warrant the expense and delay of a judicial remand." Here, because Plaintiff does not describe what

evidence was unavailable to Czarnecki or venture any argument as to how its absence renders Czarnecki's opinion untenable, I suggest remand would be improper on this ground.

Next, Plaintiff argues that the ALJ erred in rejecting Gventer's medical opinion because he failed to cite any inconsistency between Gventer's opinion and the record, and because he did not discuss all the required factors when assigning weight to her opinion. (Doc. 13 at PageID.574-575). But the ALJ was under no requirement to cite any such inconsistency. Because Gventer was not a treating physician, the ALJ was not required to grant Gventer's opinion compelling weight if it was "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). And again, the ALJ is not required to provide an "exhaustive factor-by-factor analysis." *Francis*, 414 F. App'x at 804.

Finally, I note Plaintiff seems to imply reliance on a state agency consultant is improper in and of itself. *See* (Doc. 13 at PageID.575).  That is not so. *See, e.g.*, *Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 439 (6th Cir. 2012) ("Although . . . the opinions of nontreating sources are generally accorded more weight than nonexamining sources, it is not a *per se* error of law, . . . for the ALJ to credit a nonexamining source over a nontreating source."); SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996) ("In appropriate circumstances, opinions from [non-examining sources] may be entitled to greater weight

30

than the opinions of treating or examining sources.")[4]. I therefore suggest this is not a suitable ground for remand.

### 2. The ALJ's Consideration of Plaintiff's Physical Impairments

Lastly, Plaintiff avers that the ALJ erred in failing to consider her physical impairments: her arm pain and numbness stemming from her cervical spine, and her chronic diarrhea. (Doc. 13 at PageID.576-578). The ALJ's opinion speaks softly indeed on the subject of Plaintiff's physical impairments; he does not explicitly state he considered them to be non-severe impairments, and mentions them only briefly in his explanation of how he determined Plaintiff's RFC.

Plaintiff's left arm paresthesia appears only once in the ALJ's opinion, when the ALJ notes that in an annual health examination in January 2016, she "complained of left arm paresthesia for the past two months." (Doc. 11 at PageID.43). The ALJ makes no note of the April 2016 imaging showing mild to moderate degenerative changes in the lower cervical spine, and loss of normal cervical lordosis, "probably due to muscle spasms." (Doc. 11 at PageID.440-41).

As for Plaintiff's diarrhea, the ALJ observes briefly that Plaintiff had reported taking Loperamide (Imodium) for diarrhea as needed. (Doc. 11 at PageID.42). He apparently concludes his analysis of this alleged impairment by stating: "At the hearing, she complained of diarrhea since 2011 mainly due to anxiety[,] needing to use the restroom about 8 times a day. However, . . . the medical record indicated diarrhea as a

---

[4] Although SSR 96-6p has been rescinded and replaced by SSR 17-2p effective March 27, 2017, at all relevant times in this case, it remained in effect. SSR 96-6p, 1996 WL 374180 (July 2, 1996)

new problem in 2014 but was generally improving." (*Id.*). Several months prior to that notation in the medical record, however, Plaintiff had visited the emergency room for vomiting and diarrhea. (Doc. 11 at PageID.551). And she continued to report chronic diarrhea as an issue well into 2016. (Doc. 11 at PageID.379, 387); *see* (*id.* at PageID.464). The ALJ notes neither of these facts.

Still, I suggest that any error is harmless. No source identified RFC limitations based on Plaintiff's paresthesia or chronic diarrhea. Nor does Plaintiff's brief allege that any additional limitations are required to account for her paresthesia or chronic diarrhea, let alone suggest specific limitations the RFC should have included. Plaintiff's reply avers that "significant medical evidence, including imaging, supports the existence of functional limitations," but does not elaborate further. (Doc. 15 at PageID.611).

In sum, Plaintiff suggests that the ALJ's failure to adequately discuss Plaintiff's physical impairments "renders the decision of the Commissioner legally insufficient," but entirely fails to explain how any error was harmful to her. *See Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008) (claimant bears burden of demonstrating need for more restrictive RFC); *Bickerstaff v. Comm'r of Soc. Sec.*, No. 15-cv-10917, 2016 WL 4182756, at *11 (E.D. Mich. July 15, 2016) (no error where "Plaintiff does not meet her burden of establishing that her impairments caused more limitations than those assessed by the ALJ."); *Johnson v. Colvin*, No. 14-13236, 2015 WL 4530169, at *6 (E.D. Mich. July 28, 2015) (same); *Carsten v. Comm'r of Soc. Sec.*, No. 15-14379, 2017 WL 957455, at *7 (E.D. Mich. Feb. 23, 2013) (same). As Plaintiff has failed to carry her burden, I suggest that remand is not required on this basis.

32

### 3.  Attorney Fees

As a final matter, I note that Plaintiff makes a bare-bones request for attorney fees in her motion for summary judgment. (Doc. 13 at PageID.578). I will postpone any decision on that request until the Court has reviewed this report and recommendation.

### H. Conclusion

For the above reasons, I suggest substantial evidence supports the ALJ's findings and recommend the court **DENY** Plaintiff's Motion for Summary Judgment, (Doc. 13), **GRANT** Defendant's Motion for Summary Judgment, (Doc. 14), and **DISMISS** this case.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); see also 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy

of any objections is to be served upon this magistrate judge. Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  July 27, 2018                    S/ PATRICIA T. MORRIS
                                        Patricia T. Morris
                                        United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: July 27, 2018                    By s/Kristen Castaneda
                                       Case Manager